IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                  No. CR 12-0411 JB

JOSHUA FERDMAN,
AMIR MEIR LEVI,
JEFFREY P. CONTELLA and
JOSEPH COHEN,

    Defendants.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, filed July 8, 2013 (Doc. 176)("Objection"). The Court held a sentencing hearing on May 6, 2014. The primary issue is whether Defendant Joseph Cohen was "a person in the business of receiving and selling stolen property," and, therefore, subject to a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(4), when he received fraudulently obtained cellular telephones and sold the cellular telephones through his business to third parties. The Court concludes that Cohen was not in the business of receiving and selling stolen property; rather, he was involved in receiving stolen property for approximately three weeks when he purchased sixty fraudulently obtained cellular telephones from co-Defendants Joshua Ferdman and Amir Meir Levi, but there is no evidence that he otherwise received and sold stolen property. The Court will thus sustain the Objection.

## PROCEDURAL BACKGROUND

      In the Presentence Investigation Report, disclosed April 8, 2013 ("PSR"), the United States Probation Office ("USPO") recommends a 2-level enhancement pursuant to U.S.S.G.

§ 2B1.1(b)(4). <u>See</u> PSR ¶ 72, at 19. The USPO explains:

> In the instant offense, Cohen received fraudulently obtained cellular phones form Levi and Ferdman. Cohen then sold the cellular phones through his business, ICT Global, to third parties. ICT Global is a trading company that buys and sells used electronics. In his post arrest statement, Cohen reported he purchased about $20,000 worth of cellular phones from Ferdman and made about a 5% profit margin on the phones. After he purchased the phones, he sold the phones at his physical store, ICT Global, or through his e[B]ay store, ICELLTECH. Cohen admitted he discovered most of the cellular phones had been reported as lost or stolen. Despite this discovery, Cohen continued to do business with Ferdman and Levi.
>
> As previously noted, investigation also revealed Cohen used his PayPal account to structure all monetary proceeds of his illegal activity. Cohen conducted numerous wire transfers from his PayPal account to two separate bank accounts. Cohen established a pattern of wire transfers that were made at or near the banking reporting requirements. Based on this information, it appears Cohen was in the business of receiving and selling stolen property, and a two level increase is applied.

PSR ¶ 72, at 19.

Cohen objects to the 2-level enhancement, because, in his view, "[t]here is no evidence of the 'regularity and sophistication of the defendant's activities' other than the brief two to three week period when Mr. Cohen bought and sold the cellular phones at issue in this case." Objection at 10. He contends that "[t]here is no evidence of the value or size of the inventory of stolen property other than these cell phones and there is no evidence that Mr. Cohen's activities here encouraged or facilitated the commission of other crimes by other people besides the instant offenses and his co-defendants." Objection at 10. He argues that the USPO's statement regarding the financial structuring of his business is speculation. <u>See</u> Objection at 10.

The United States asserts that, because Cohen pled guilty to receiving and selling stolen property, the only question is whether he was in the business of receiving and selling stolen property for the enhancement to apply. <u>See</u> United States' Response to Defendant's Objections

to the Presentence Report and Sentencing Memorandum at 2-3, filed July 11, 2013 (Doc. 180)("Response").  The United States maintains that the four factors from the application notes to § 2B1.1 all weigh in support of finding that Cohen was in the business.  It explains that Cohen "did a substantial business in 'bad ESN' phones,"[1] and that "'bad ESN' phones are either lost, stolen, or obtained by fraud."  Response at 3.  Next, the United States points out that Cohen "purchased approximately $20,000 worth of phones from co-defendant Joshua Ferdman," and argues that there is "strong evidence" that Cohen understood the cellular telephones were stolen, based in part on the "text message exchange between Defendant and Ferdman in the course of the conspiracy."  Response at 3-4.  The United States argues that Cohen structured his business banking transactions in a way to "avoid federal reporting requirements pertaining to deposits and withdrawals," by making numerous deposits under $10,000.00 in one day.  Response at 4. Further, the United States contends that Cohen posted the "bad ESN" cellular telephones for sale on his online store, that he had "little difficulty finding buyers for the large quantity of phones" that the co-Defendants provided, and that the co-Defendants viewed him as a "reliable purchaser," which "was clearly a motivating factor" for the co-Defendants to fraudulently obtain the cellular telephones.  Response at 4-5.

In the Reply, filed August 8, 2013 (Doc. 199), Cohen states that he "does not quarrel with the fact that he purchased approximately $20,000.00 worth of lost, stolen, or obtained by fraud phones over a 3 month period from his co-defendant, Mr. Ferdman, and acknowledged his wrongdoing," but he argues that he was not "in the business" of receiving stolen property.  Reply

---

[1] The PSR indicates that each cellular telephone has a unique Electronic Serial Number ("ESN"), and that, "when Sprint learns that a phone has been lost, stolen or obtained by fraud, Sprint essentially 'blacklists' the ESN corresponding to the phone, so that the phone can never again be activated on the Sprint network."  PSR ¶ 14, at 6.  "Such a phone is colloquially known as having a 'bad ESN.'"  PSR ¶ 14, at 6.

Case 1:12-cr-00411-JB   Document 273   Filed 08/04/14   Page 4 of 11

at 4. He asserts that he "conducted the lion's share of the business" legitimately, that he "had been in the business of buying [and] selling phones since 2004, and the amount of business conducted with Mr. Ferdman amounted to only a small fraction of the total business conducted by ICT over the years." Reply at 4. He emphasizes that it is "not illegal to buy or sell phones which are labeled as 'bad ESN,'" and that "[m]ajor carriers or networks offer to flash or reprogram such devices on their own networks, regardless of the ESN status with the original service provider." Reply at 5. In response to the argument that he structured his banking to avoid oversight, he explains that "the company was audited by the IRS as recently as 2011, and was given a 'clean bill of health,' finding no impropri[eties] in the manner in which accounting, business, and tax practices were conducted." Reply at 5.

At the hearing, Cohen explained that the business that he and his wife owned, ICT Global, exceeded one million dollars in sales during 2011, while the investigation revealed that he purchased sixty of the ninety-six cellular telephones that Ferdman and Levi fraudulently obtained from Sprint. See Transcript of Hearing at 34:2-8 (Severo), taken May 6, 2014 ("Tr.").[2] Cohen argued that the portion of Cohen's business dedicated to selling stolen merchandise, both in time and money, was "very limited." Tr. at 4:13-19 (Severo). He emphasized that the stolen merchandise constituted less than two percent of his sales, with $20,000.00 in sales from the stolen merchandise and over one million dollars in sales, although he did not have a fixed figure on gross sales. See Tr. at 6:1-4 (Severo). He argued that the business banking transactions are not illegal and that there is no evidence that they have anything to do with the stolen merchandise. See Tr. at 6:15-22 (Severo).

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

- 4 -

The United States maintained that Cohen meets enhancement's elements, because he was regularly receiving the stolen cellular telephones, and his activities "encouraged and facilitated other crimes." Tr. at 8:17-23 (Sullivan). It emphasized that "stealing cell phones is a . . . dangerous business," and that "[p]eople are going to steal more cell phones if there's a market for their cell phones, and the defendant here provided that market." Tr. at 9:3-5 (Sullivan).

Cohen responded that "there is no evidence anywhere either in the underlying investigation or anything that was provided to probation that shows that he was regularly involved in the purchase and sale of stolen merchandise." Tr. at 9:9-14 (Severo). Cohen argued that, "[i]f anything, it is a deviation from his regularly conducted activity, which was . . . legitimately buying and selling phones." Tr. at 9:20-25 (Severo).

After the Court noted that Cohen admitted in the Reply that he received fraudulently obtained cellular telephones from Ferdman for three months, see Tr. at 10:25-11:1, Cohen responded that he was involved in receiving and selling stolen merchandise for only eighteen days, between May 8, 2011, and May 26, 2011, see Tr. at 16:25-17:7 (Severo), and that it was previous counsel who had admitted to the three-month span, see Tr. at 20:11-16 (Severo). Cohen clarified that he was not involved in purchasing the cellular telephones that Levi fraudulently obtained in August, 2011, and so he argued that finding that he was involved in criminal activities for three months is incorrect. See Tr. at 17:19-18:2 (Severo). The Court asked the UPSO to address Cohen's calculation as including only eighteen days in May, and the USPO agreed that "defense counsel's position accurately summarizes Mr. Cohen's accountability in this offense, that his conduct spanned [an] estimated three-week time frame in May as opposed to three months." Tr. at 23:11-24 (Court, Probation Officer). The Court asked the United States if it had any reason to dispute Cohen's representation that he had over one million dollars in sales,

and the United States said that it did not.  See Tr. at 24:8-18 (Court, Sullivan).

The Court initially noted that it thought the United States had met its burden for the enhancement, but explained that it had based that conclusion in part on Cohen's admission in the Reply that he was involved in receiving stolen merchandise for three months rather than eighteen days, and based on his net worth and the amount of money seized, which was roughly $500,000.00, instead of his gross sales, which was over one million dollars.  See Tr. at 24:20-25:1 (Court).  The Court said that, without evidence regarding the rest of Cohen's business, it would be speculation to assume that he had received any other stolen property other than the cellular telephones he received from Ferdman and Levi.  Tr. at 26:2-7 (Court).  The Court said it would sustain Cohen's objection and would not apply the 2-level enhancement under § 2B1.1(b)(4).

## ANALYSIS

The Court will sustain Cohen's Objection and will not apply the 2-level enhancement under § 2B1.1(b)(4), because the Court concludes that Cohen was not "in the business of receiving and selling stolen property."  Section 2B1.1(b)(4) states: "If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels."  U.S.S.G. § 2B1.1(b)(4).  The application notes explain:

> For purposes of subsection (b)(4), the court shall consider the following non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property:
>
> (A)   The regularity and sophistication of the defendant's activities.
>
> (B)   The value and size of the inventory of stolen property maintained by the defendant.
>
> (C)   The extent to which the defendant's activities encouraged or facilitated other crimes.

(D) The defendant's past activities involving stolen property.

U.S.S.G. § 2B1.1(b)(4) cmt. n.5.

First, regarding the "regularity and sophistication of the defendant's activities," the Court notes that Cohen was involved in receiving stolen merchandise for only eighteen days, and ICT Global's gross sales -- over one million dollars -- dwarf the amount of fraudulently obtained merchandise he received -- roughly $20,000.00. Although Cohen, through previous counsel, admitted that he received stolen merchandise over a three-month period, see Reply at 4, the parties and the USPO agree that he was involved for only eighteen days. With less than two percent of his business over three weeks, the "regularity" of Cohen's activities in receiving and selling stolen merchandise is marginal. The United States also points to Cohen's ability to sell "bad ESN" cellular telephones through his businesses and his pattern of structuring his business banking transactions, while Cohen contends that selling bad ESN devices is not necessarily illegal, nor is his practice of banking. While some cellular telephones have a bad ESN because the customer did not pay his or her bills, "the vast majority of 'bad ESN' phones are the product of theft, loss, or fraud." PSR ¶ 14, at 6. Cohen's ability to sell "bad ESN" cellular telephones, at least some of which he knew were stolen, may point to his sophistication in dealing with stolen property. Overall, however, the Court concludes that this factor weighs against finding that Cohen was "in the business" of receiving and selling stolen property.

Regarding the "value and size of the inventory of stolen property maintained by the defendant," Cohen admits that he received over $20,000.00 worth of fraudulently obtained cellular telephones, but he points out that he

> conducted the lion's share of the business by holding properly issued business and seller permits, paid local, state, and federal taxes, and operated the business in a

> business like manner, other than his dealings with Mr. Ferdman.  Mr. Cohen had been in the business of buying [and] selling phones since 2004, and the amount of business conducted with Mr. Ferdman amounted to only a small fraction of the total business conducted by ICT over the years.

Reply at 4.  The Court disagrees that, because Cohen operated a legitimate business, he could not also be in the business of receiving and selling stolen property.  The Seventh Circuit addressed this argument in United States v. Natour, 700 F.3d 962 (7th Cir. 2012), where the defendant "sold approximately 1500 [stolen] phones" over a period of five months, but argued that § 2B1.1(b)(4) should not apply, because "he operated a legitimate cell phone business."  700 F.3d at 966, 968.  Although the defendant "operated a legitimate business that contained legitimate inventory," the Seventh Circuit explained that "there is simply no reason that operation of a separate, legitimate enterprise undermines the fact that, over a period of several months, he engaged in a pattern of serious criminal conduct involving a significant quantity of stolen goods."  700 F.3d at 975.  The Court concludes that the fact that Cohen also operates a legitimate business does not preclude the finding that he is in the business of receiving and selling stolen property.

Although Cohen sells "bad ESN" cellular telephones, he argues that selling "bad ESN" devices does not necessarily mean that he is receiving or selling stolen property, Reply at 5, because some "phones can also receive a 'bad ESN' designation as a result of non-payment of bills," PSR ¶ 14, at 6.  The Court notes that "the vast majority of 'bad ESN' phones are the product of theft, loss, or fraud," PSR ¶ 14, at 6, but, because there is no evidence that the other bad ESN cellular telephones in ICT Global's stock were also stolen or fraudulently obtained, the Court will consider only the $20,000.00 worth of cellular telephones that Cohen received from Ferdman and Levi.  While this number is not a small one, it is less than the "between $100,000

and $300,000" value of the cellular telephones involved in United States v. Natour, and the $20,000.00 represents less than two percent of ICT Global's gross sales.  The Court concludes that this factor weighs against finding that Cohen was in the business of receiving and selling stolen property.

Next, as to the factor that looks at the "extent to which the defendant's activities encouraged or facilitated other crimes," the Court notes that Cohen's conduct encouraged Ferdman and Levi to fraudulently obtain additional cellular telephones.  Cohen was aware, through his text message conversations with Ferdman, that Ferdman was fraudulently obtaining cellular telephones from Sprint and then selling them to Cohen.  Cohen also told Ferdman that about half of the cellular telephones "were reported lost or stolen," yet he "still agreed to purchase approximately 20 phones."  PSR ¶ 18, at 7.  Because Cohen was willing to purchase cellular telephones from Ferdman, knowing that they had been reported as lost or stolen, he provided an avenue for Ferdman and Levi to sell the devices that they fraudulently obtained.  Cohen facilitated Ferdman's and Levi's crimes.  The Court concludes that this factor weighs in favor of finding that Cohen was in the business of receiving and selling stolen property.

Finally, regarding the "defendant's past activities involving stolen property," the Court sees no other evidence that demonstrates whether Cohen has previously engaged in receiving and selling stolen property.  Although the United States points to the number of bad ESN cellular telephones he had for sale through his business, this evidence alone does not necessarily demonstrate that the devices are stolen.  This factor weighs against finding that Cohen was in the business of receiving and selling stolen property.

One of the four factors weighs in favor of finding that the § 2B1.1(b)(4) enhancement applies, and three of the factors weigh against finding that the enhancement applies.  The Court

is most persuaded by the few days that Cohen was involved in receiving stolen merchandise from Ferdman and Levi -- eighteen days -- and the small percentage of his business dedicated to selling the stolen merchandise -- less than two percent.  When the Court carefully compares the facts here to the cases that have found that the enhancement applies, the Court's application of the enhancement would set the furthest limit; the Court is not willing to go that far, for fear that it would be close to saying that any legitimate business that ever intentionally buys stolen property is in the business of receiving and selling stolen property.  More business must be shown than eighteen days and two percent of gross income.  Two percent might be enough of a business over a period of years, but not for a finite period of time.  If Exxon earned two percent of its gross income year after year from receiving and selling stolen property, that looks like its business; if a pawn shop earns one-hundred percent of its gross income from receiving and selling stolen property in eighteen days, that looks more like its business.  It is the combination of a short period of time and low proceeds that make ICT Global's conduct for eighteen days look less like a business and more like aberrant criminal conduct.  The Court concludes that Cohen was not in the business of receiving and selling stolen property; thus, it will not apply the 2-level enhancement under § 2B1.1(b)(4).

**IT IS ORDERED** that Defendant Joseph Cohen's objection in the Defendant's Sentencing Memorandum, filed July 8, 2013, is sustained.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Stephen R. Kotz
Cynthia L. Weisman
Sean J. Sullivan
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Kirtan K. Khalsa
Khalsa Law Office
Albuquerque, New Mexico

--and--

Michael V. Severo
The Severo Law Firm
Pasadena, California

*Attorneys for Defendant Joseph Cohen*